# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Susan Moultrie, | : | Case No. 1:07-CV-899 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING |
| | : | DEFENDANTS MOTION TO |
| Hamilton County Department of Job | : | DISMISS AND MOTION FOR |
| and Family Services, et al. | : | SUMMARY JUDGMENT |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion to Dismiss and Motion for

Summary Judgment and Memorandum in Support, with Supporting Affidavits (hereinafter

"Motion for Summary Judgment"). (Docs. 41, 42.)[1]  Plaintiff Susan Moultrie brought this

action against her former employer, Hamilton County Department of Job and Family Services,

the Hamilton County Board of County Commissioners, and Hamilton County asserting claims

for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 et seq., and Chapter 4112 of the Ohio Revised Code.  Plaintiff also asserts claims

for disability discrimination and retaliation in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and

Chapter 4112 of the Ohio Revised Code.  Finally, Plaintiff also alleges a violation of Ohio public

policy.  Defendants move for summary judgment and for the dismissal of all of Plaintiff's

---

[1] Defendants filed the same motion twice – once as a "Motion to Dismiss and Motion for
Summary Judgment" (doc. 41) and once as a "Motion for Summary Judgment and Motion to
Dismiss" (doc. 42).

claims. Plaintiff opposes Defendants' Motion for Summary Judgment as to all claims except the Ohio public policy claim, which Plaintiff explicitly does not oppose. (Doc. 46.) For the reasons that follow, the Court **GRANTS** Defendants' motion for summary judgment.

## I. BACKGROUND[2]

### A. Plaintiff's Employment with Hamilton County Department of Job and Family Services

Susan Moultrie (D.O.B. 11/10/1956) was terminated from her position at Defendant Hamilton County Department of Job and Family Services ("HCJFS" or "the Department") in June 2006. Prior to her termination, Moultrie worked for HCJFS in a number of different positions for approximately sixteen years. Moultrie began her employment with the Department as a "Homemaker" in October of 1989. As a Homemaker, Moultrie was responsible for going to the homes of elderly consumers[3] to provide assistance with daily living skills, such as grocery shopping, housekeeping, laundry, and cooking. Moultrie's supervisor at that time was Dorothy Mays, who in turn reported to Sheila Logan.

Moultrie transferred to a different Homemaker position in Children's Services in 1995. While employed in that position, in March of 1999, Moultrie served a three-day suspension for performance related problems. In January of 2001, Moultrie was suspended again for five days

---

[2] Except as otherwise indicated, background facts are from Defendants' Proposed Statement of Undisputed Facts (doc. 41-6) to the extent they are admitted by Plaintiff in Plaintiff's Response to Defendants' Proposed Undisputed Facts (doc. 45). The Court notes that in responding to Defendants' Proposed Statement of Undisputed Facts, Plaintiff gave no explanation for her denials. Instead, Plaintiff merely cited to portions of the record that in many cases did not contradict the facts proposed by Defendants. Nonetheless, to the extent the parties did not explicitly agree on any statement of fact, the Court cites to the portion of the record providing support for the statement.

[3] Clients of or people seeking services from HCJFS are referred to as "consumers."

for attendance and performance related problems. Later the same year, she was suspended a third time, for ten days, once again for attendance and performance related problems. In order to avoid termination as the next step in the disciplinary process, in April of 2002, Moultrie applied for a transfer back to the Homemaker Program serving elderly consumers. Sheila Logan awarded the position to Moultrie, effective May 9, 2002. On Moultrie's 2002 performance review, Logan noted that Moultrie was thorough and that she had received positive feedback from consumers. (Logan Dep. Ex. 8.) Logan also noted that Moultrie needed to work on submitting her mileage paperwork and weekly schedule in a timely manner. (Id.; see also Moultrie Dep. 63:24-65:10.) However, Moultrie was never subject to discipline for timeliness issues in that Homemaker position. (Logan Dep. 118:16-19.)

In early 2003, Logan began supervising the Enhanced Medicaid Transportation Program ("EMT Program"),[4] a program under HCJFS through which anyone in Hamilton County who is on Medicaid can obtain assistance with transportation to medical appointments with Medicaid providers. (Id. 17:13-19:4, 31:14-16.) At that time, the program had six or seven employees. (Id. 18:12-14.) Shortly after Logan took over supervision of that program, Moultrie applied for a transfer to a vacant "Medicaid Transportation Eligibility Determiner" ("EMT"),[5] or "Social Service Aide 2," position within the program. (Id. 29:7-15, 31:9-17; Moultrie Dep. Ex. 7.) In March 2003, Moultrie, who was one of three applicants, was selected for the position. (Logan Dep. 29:12-15, 30:10-19.) Logan testified during her deposition that the co-supervisor to the

_____

[4] The name of the program has since changed to "Non-Emergency Transportation." (Logan Dep. 34:7-15.)

[5] Defendants often use the acronym "EMT" to refer to a staff member of the EMT program.

EMT Program, Steven Knight, was the person who decided to hire Moultrie. (Id. 29:16-22.)

Logan also indicated, however, that she played a role in the determination, testifying, for

example, that she and Knight decided that Moultrie was the best fit for the position at that time

and that she believed Moultrie was motivated and would do a good job. (Id. 30:20-31:8.)

Knight retired shortly after selecting Moultrie for the EMT position. After his retirement, Logan

became the primary supervisor of the program. (Id. 29:20-30:9.)

   As an EMT, Moultrie was responsible for verifying the eligibility of consumers seeking

transportation assistance for medical appointments with Medicaid providers and for coordinating

the requested transportation. (Moultrie Dep. Ex. 8; Logan Dep. 18:23-19:9, 19:22-21:18.) In

general, the procedure for scheduling consumer transportation was as follows: Consumers were

divided alphabetically by last name among the EMTs. (Logan Dep. 19:22-2, 89:21-24.) EMTs

maintained a folder for each consumer containing paperwork such as intake forms documenting

the consumer's demographic information. (Id. at 21:4-8, 23:5-6.) Consumers or individuals

seeking assistance for consumers made transportation requests via telephone, fax, or email. (Id.

19:10-14, 20:4-7.) When a request for service was made, the EMT assigned to the consumer had

to verify the consumer's eligibility by using a State of Ohio database, the "CRIS-E," to

determine whether or not the consumer was on Medicaid at the time of the request.[6] (Id. 20:8-

19.)

   According to Logan, the EMT position involved more paperwork than Moultrie's

previous Homemaker positions. (Logan Dep. 29:2-6.) For example, an EMT had to send a

_____

   [6] In addition to verifying a consumer's Medicaid status upon a request for service, the
EMTs were also responsible for re-verifying the Medicaid status of their consumers and
including documentation of the verification in each consumer's file on a monthly basis. (Logan
Dep. at 23:7-14.)

variety of forms to the consumer depending on whether the request for service was granted or denied. (Id. 22:18-23:8.) If service was denied, the EMT sent a denial letter. (Id. 23:3-4.) If the service request was granted, the EMT sent the consumer a conditional approval letter, approving transportation services on a conditional basis for thirty days, and a medical form that the consumer had to return to the EMT within the thirty-day period. (Id. 22:18-24.) After the consumer returned the medical form, the EMT sent an approval letter to the consumer. (Id. 22:18-24.) The EMT also was responsible for determining what type of transportation best suited the particular consumer. (Id. 21:19-22:13.) If the consumer had access to a car and had the necessary insurance and a valid driver's license, the Department provided mileage reimbursement rather than arrange for separate transportation. (Id.) Consumers who lacked access to a car could obtain bus tokens. Disabled consumers sometimes qualified for transportation through a contracted vendor or cab service. (Id.) The EMT had to fill out different forms for each form of transportation. (Id. 23:18-24:17.)

In addition to completing the normal paperwork, the EMTs had to input information related to the consumer's request and the services rendered, such as whether the service was the provision of bus tokens or the scheduling of transportation through a vendor, into a computerized database. (Id. 46:17-47:18.) The database was implemented around the same time that Moultrie transferred to the EMT program. (Id. 45:5-12.)

EMTs also had to complete paperwork related to the HCJFS's Workload Management System ("WLMS"), a quality assurance system through which each program area kept track of performance of essential job functions. (Logan Dep. 34:21-35:4.) HCJFS staff, including Moultrie, had to submit a weekly WLMS form detailing the amount of time it took them to

perform certain tasks. (Id. 35:1-36:12; 38:1-8.) The amount of time that it took to complete the WLMS forms was not included as one of the tasks that employees were to monitor, though some complained that the process was time consuming. (Id. 70:20-71:4.)

Logan was not initially concerned about Moultrie's ability to manage the increased paperwork in the EMT position. (Id. 31:20-24.) Logan believed that with assistance in learning the job, Moultrie would be able to handle the responsibility. (Id. 32:4-6.) In fact, according to Logan, Moultrie was motivated and seemed to like her job during her first six months as an EMT. (Id. 32:7-16.) However, Logan began to notice problems with Moultrie's performance in the latter portion of 2003 and during 2004. (Id. 32:14-23.)

### B. Problems Arising During Moultrie's Employment as an EMT

Just a few months prior to transferring to the EMT position, Moultrie began to suspect that she suffered from Attention Deficit Disorder ("ADD") and scheduled an appointment with Dr. David Zucker, a psychologist, for January 9, 2003. (Moultrie Dep. 61:3-62:13; Zucker Dep. 5:2-3, 7:23-8:6.) At that appointment, Dr. Zucker gave Moultrie a survey that she was to fill out at home and two additional surveys for people observing Moultrie's behavior. (Moultrie Dep. 62:14-17.) At that time, Moultrie explained to Logan that she was experiencing ADD-related issues, such as issues with paperwork, and asked Logan to complete one of the observer surveys.[7] (Id. 62:23-25, 63:15-23.) Moultrie went to two more therapy sessions with Dr. Zucker in early 2003, each of which lasted approximately fifty minutes. (Moultrie Dep. Ex. 9; Zucker Dep. 41:23-42:1, Ex. 12.)

---

[7] It appears from the evidence that Logan completed the survey, though the survey itself was not provided as evidence in this case. (Zucker Dep. 28:20-23, 63.)

By May 2003, after seeing Moultrie only three times, Dr. Zucker diagnosed Moultrie with ADD, inactive type.  (Moultrie Dep. 65:3-9, Ex. 10; Zucker Dep. Ex. 10.)  Dr. Zucker wrote a letter, dated May 14, 2003, to Moultrie's primary care physician, Dr. Carrigan, to notify him of the diagnosis.  (Zucker Dep. 68:12-21, Ex. 10.)  The letter indicates that Moultrie sought treatment from Dr. Zucker because she "was experiencing difficulties at work," and believed she might be suffering from ADD.  (Id. Ex. 10.)  The letter also describes the nature of Dr. Zucker's evaluation of Moultrie and some of the symptoms Moultrie was experiencing, such as difficulty organizing her work.  (Id.)  After being diagnosed with ADD, Moultrie appears to have sought further treatment from Dr. Carrigan, who prescribed Adderall.  (Moultrie Dep. 69-75.)  According to Moultrie, the Adderall helped her focus, but she was unable to take it on a consistent basis due to financial constraints.  (Id. 75:1-20.)

Logan admits that as of the latter portion of 2003, she knew of Moultrie's belief that she suffered from ADD.  (Logan Dep. 66:15-24.)  Logan testified that she suggested to Moultrie that she seek medical attention and let Logan know if she received any recommendation of accommodations from a doctor.  (Id. 67:4-11.)  However, Moultrie denied that Logan ever made such a suggestion.  (Moultrie Dep. 112:18-22.)  Moultrie claims instead that, at some point during 2003, another HCJFS employee, Sandra Costa, told her that if she provided some form of documentation of the diagnosis the Department might be able to provide some form of help at work.  (Id. 65:13-66:11.)  Costa began to work with Moultrie in 2003, when HCJFS hired an outside consultant to help bring the EMT program into compliance with the Ohio Revised Code and increase the accountability of the EMT staff.  (Logan Dep. 73:21-24, 75:2-8; Costa Dep. 8:5-11.)  The Department assigned Costa to work with the consultant on a full-time basis.  (Costa

Dep. 7:20-8:7, 10:3-4.)  During the time that Costa worked with the consultant, Costa performed an evaluation of the EMT program, but she did not supervise the EMT staff.  (Id. 8:16-22, 10:19-11:3.)  However, Costa was working in close proximity with Moultrie in 2003 when Moultrie indicated to Costa that she thought she had ADD and Costa advised Moultrie to provide documentation.  (Id. 23:1-25:1.)

The point at which Moultrie actually provided that documentation to HCJFS is in dispute. During her deposition, Moultrie testified that she submitted a copy of Dr. Zucker's May 14, 2003 letter to Logan sometime during 2003.  (Moultrie Dep. 82:10-83:22.)  Logan disputes this, however, and claims that Moultrie did not submit copy of the letter until October 2004, after being disciplined for performance issues.  (Logan Dep. 66:17-67:19.)  The question of when Moultrie notified Logan of her diagnosis is discussed in greater detail below.  In any case, it does not appear that Moultrie made any formal request for accommodations until October 2004.

By that time, Moultrie had already received a number of warnings and reprimands regarding her job performance.  The first problem that Logan noticed after Moultrie transferred to the EMT position was that Moultrie was having problems keeping up with the paperwork. (Logan Dep. 32:14-23.)  Then, on January 30, 2004, Logan issued a written warning to Moultrie for being listed on the agency's "Top Talker Report," indicating that Moultrie made excessive personal telephone calls during her scheduled work hours.  (See Moultrie Dep. Ex. 16.)  On the warning, Logan noted the effect the personal telephone calls were having on Moultrie's performance:  "I have received complaints of consumers being unable to contact you, as your voice mail is full, that telephone calls are not being returned, and trips are not being scheduled at all or not scheduled accurately."  (Id. Ex. 16.)  During her deposition, Moultrie admitted that at

the time she received the written warning, she was having trouble promptly returning calls to consumers and scheduling trips.  (Id. 95:7-24.)

In or around March 2004, Logan began getting complaints from her own supervisor, Phyllis Brown, about Moultrie's problems.  Prior to that time, Logan had informed Brown that Moultrie thought she had ADD.  (Logan Dep. 123:1-11, Ex. 10.)  On March 17, 2004, Brown sent Logan an email indicating that she had received several complaints about pregnant consumers missing appointments because they had not been scheduled.  (Id. 121:17-123:22, Ex. 10.)  Brown expressed concern about Moultrie's organizational skills and, more generally, about Moultrie's ability to handle the job.  (Id.)  Brown instructed Logan to "work with [Moultrie] on a corrective action plan that addresses her work."  (Id. Ex. 10.)  Shortly thereafter, on March 25, 2004, Logan gave Moultrie a written reprimand for unsatisfactory job performance.  The reprimand, which was signed by both Logan and Moultrie, states as follows:

> Susan, this is to inform you that your job performance is not satisfactory.  I have received many calls and complaints from consumers, CSO, and community professionals, that consumer trips have either not been scheduled, or have been scheduled incorrectly.  I have given you both oral and written instructions to schedule consumer appointments, and this is either not done, or the information is entered incorrectly.

> Consumers, and community professionals have complained that they leave you messages on your voicemail, and they never receive a return call from you.  Others state that when they talk to you, you assure them that you will schedule their trip.  When they check with the transportation company, there is no record that the trip was scheduled. When I check the database, these trips have not been entered.

> There is concern about your documentation and the processing of paperwork.  You are slow to complete your authorizations and your WLMS is not turned in timely.

> We have met frequently to discuss the need for improvement in the performance of your job.  Please be advised that your current level of performance is

> unsatisfactory. Further discipline will be warranted if there is no improvement in your job performance.

(Id. Ex. 11; Moultrie Dep. 99:24-100:14, Ex. 22.) During her deposition, Moultrie acknowledged that she received the March 25, 2004 reprimand. (Moultrie Dep. 100:12-14.) Moultrie further admitted that because of all the work she had to do in January, February, and March of 2004, she may have had a problem returning phone calls, scheduling transportation, and submitting her WLMS paperwork in a timely manner. (Id. 101:3-103:7.) Around the same time as Moultrie received the reprimand, the responsibility for scheduling pregnant consumers was removed from Moultrie and assigned to someone else. (Id. at 98:3-21.)

A few months later, in July 2004, Logan issued another memorandum to Moultrie regarding Moultrie's telephone usage, indicating that Moultrie was still spending an unacceptable amount of time on the telephone for personal business. (Id. 105:22-107:8, Ex. 23.) The memorandum specifically ties Moultrie's telephone usage to her performance issues, stating, "The amount of time that you are spending on the telephone for personal business decreases your availability to provide quality service to your consumers." (Id. Ex. 23.)

Around the same time as Moultrie received that memorandum, Logan also addressed problems with Moultrie's punctuality. (Moultrie Dep. Ex. 24.) Moultrie had previously requested, and was granted, a flex schedule of 8:30 a.m. to 5:15 p.m. to accommodate her child care issues. During May and June, 2004, Moultrie seldom began work at the requested flex time of 8:30 a.m. As a result, in July 2004, Logan placed Moultrie on an action plan to assist her in improving her punctuality. Pursuant to that plan, Moultrie had to report any deviation in her scheduled work hours and her punctuality was to be monitored from July 14, 2004 to September 30, 2004. (Id.)

The July 2004 semi-annual review of Moultrie's performance, completed by Logan, reveals that Moultrie continued to have difficulty with organization of daily tasks, maintenance of case records, and scheduling consumers and submitting paperwork in a timely manner.[8] (Logan Dep. 128:21-129:3, Ex. 13.) The review also notes that Moultrie failed to maintain good customer service in that she received fifty percent of all of the complaints received by the entire EMT unit. (Id. Ex. 13.) Nevertheless, the July 2004 review also indicates that Moultrie had properly scheduled ninety-five percent of consumer appointments, maintained a positive outlook, worked well with her co-workers, and met with walk-in consumers within the required time frame. (Id. Ex. 13.)

Moultrie was not the only employee to have had problems keeping up with work in 2004. Many of the employees were unhappy about the changes that took place in the Department during that time,[9] and as a result the morale among staff was low. (Logan Dep. 75:12-23; Costa Dep. 20:4-16.) During the first half of 2004, the entire EMT unit was backlogged, and overtime

_____

[8] The review notes that to assist her in scheduling consumer transportation, Moultrie had begun to record her voicemail messages and appointments in a planner. (Logan Dep. 129:17-24, Ex. 13.) According to Logan, all of the EMT staff were asked to document their voicemail messages in the planner. (Logan Dep. 129:17-24.) Logan believed the procedure operated as a means to help Moultrie with organization. (Logan Dep. 130:7-10.) Logan further claimed that in working with Moultrie, she instructed Moultrie to fully complete the scheduling for one customer before dealing with the next customer. (Logan Dep. 130:14-22.) According to Logan, Moultrie seldom followed that advice. (Logan Dep. 131:1-2.)

[9] A number of changes took place in 2003 and 2004. For example, the Department moved the EMT staff to a new location and implemented a new computerized database to record consumer information and schedule transportation. (Logan Dep. 57:1-7, 127, Ex. 12.) In addition to those changes, the Department, through the assistance of the consultant, made several changes to the forms used by the EMT staff to bring the EMT program into compliance with the Ohio Administrative Code. (Logan Dep. 74:5-16; Costa Dep. 10:19-11:3, 11:24-12:6.) Also, during that time, the consultant and other management personnel shadowed the EMT staff to evaluate their work and increase accountability. (Logan Dep. 75:2-8.)

was authorized for the EMTs on an as needed basis. (Logan Dep. 82:13-83:4.) The EMTs were given even more work in the latter half of 2004 after the Department lost three EMTs – one through the elimination of a position, one through termination,[10] and one through a transfer to another position within the Department. (Id. 92:21-93:12.) The work previously handled by those EMTs was redistributed to the remaining three EMTs who then had to perform the work of five EMTs. (Id. 93:6-15.) As a result, the EMTs were offered overtime to complete their work; however, Moultrie was unable to take advantage of the overtime due to child care issues. (Id. 100:1-101:12; Moultrie Dep. 133:12-134:23.) The other two EMTs, in contrast, were able to work overtime. (Logan Dep. 101:7-12, 137:16-22.)

### C.    Request for Accommodations and Continuing Performance Problems

On October 1, 2004, Logan sent an email to Moultrie summarizing a discussion between she and Moultrie regarding Moultrie's poor job performance and instructing Moultrie to provide medical documentation of the ADD she claimed to have. In that email, Logan outlined Moultrie's performance problems, including failure to schedule transportation and inaccurate scheduling, failure to return consumers' phone calls, difficulty meeting deadlines and completing paperwork, and problems with organizing files. (Moultrie Dep. Ex 25.) The email also states the following regarding Moultrie's alleged ADD:

> We discussed you providing medical documentation for having ADHD. I requested that you provide medical documentation prior to 10-11-04 regarding this disability. I requested that you have your doctor state what aspects of your job are difficult and require you to need assistance or special accommodations to perform your job duties. If you are having difficulty with filing, concentration,

_____

[10] According to Logan, the employee who was terminated, Bailey Hill, had repeated problems within the Department because he did not complete his work on time, took extended lunch breaks, and provided transportation to consumers without documentation. (Logan Dep. at 52.)

difficulty in performing multiple tasks because of the ADHD, your physician
should state this.
If no medical documentation is provided by 10-11-04, you may be facing
disciplinary actions due to inadequate job performance.

(Id.)

On October 5, 2004, Moultrie submitted to Logan a copy of the May 14, 2003 letter from

Dr. Zucker to Dr. Carrigan, in which Dr. Zucker informed Dr. Carrigan that he had diagnosed

Moultrie with ADD, inactive type. (Id. Ex. 12.) The letter does not suggest any accommodation

or in any way discuss the issue of possible accommodations. Logan maintains that this was the

first time Moultrie notified her of the official diagnosis. (Logan Dep. 66:17-67:19.) Moultrie

has given contradictory statements on the matter. In her Response to Defendants' Proposed

Undisputed Facts, Moultrie admits that she submitted the May 14, 2003 letter confirming her

diagnosis to Logan on October 5, 2004. (See doc. 45 ¶ 21; Moultrie Dep. Ex. 12.) Consistent

with that admission, Moultrie also alleges in her Second Amended Complaint that "On or about

October, 2004 Plaintiff disclosed to Defendants that she had been diagnosed with Attention

Deficit Hyperactivity Disorder ("ADHD")." (Doc. 11 ¶ 13 (emphasis added).) However, in her

deposition, Moultrie testified that she submitted the letter to Logan sometime during 2003 and

that the notation that appears at the bottom left corner of the document – "Submitted to S.L. 10-

5-04" – is wrong. (Moultrie Dep. 82:10-83:22.) Moultrie further claimed that Logan was lying

about having received the letter on October 5, 2004. (Id. 83:4-10.)

On October 14, 2004, Dr. Zucker provided a letter to Defendants on Moultrie's behalf

outlining accommodations he believed would assist Moultrie in the workplace in light of her

ADD. Dr. Zucker based the letter on the contact he had with Moultrie prior to March 25, 2003,

the last time that he saw her. In this letter, Dr. Zucker noted that ADD is "characterized by

difficulties in controlling, organizing and planning." (Logan Dep. Ex. 15.) The letter also states that Moultrie had reported that she was "easily distracted by noise and visual distractions." (Id.) Dr. Zucker suggested the following accommodations:

1. A flexible work schedule that would enable Moultrie to work when there are less visual and auditory distractions;

2. Headphones or other noise masking devices;

3. Division of large work tasks into smaller, more manageable chunks of work;

4. Breaks between tasks;

5. Assistance from a workplace coach; and

6. Help with organization of the work area through the use of tools such as colored tags, colored folders, or bins.

(Id.) A week later, on October 21, 2004, Moultrie also provided her own letter to Logan, requesting the assistance of a job coach. (Moultrie Dep. Ex. 27; Logan Dep. Ex. 16.) The letter stated as follows:

I was diagnosed with ADD, (attention deficit disorder) in May of 2003. With this disorder, I have problems with sometimes focusing, organization, completing multi-tasks, meeting deadlines, and paperwork, i.e. files etc. Although I struggle in these areas, there is help available. There are coaches available to help individuals such as myself in the workplace. I am requesting such assistance that could support me in the workplace. I know that I am a good worker, and would like to be an asset to my unit. It is very frustrating to me, would you help me?

(Id.)[11] Moultrie admits that this was the first time she had requested assistance in the workplace. (Moultrie Dep. 130:24-131:15.)

---

[11] Logan indicated during her deposition that she did not read Moultrie's letter to be a request for any specific accommodations. (Logan Dep. 136:1-8.) Nevertheless, Logan claims she spoke with Moultrie about getting a job coach. (Id.)

After receiving the letters and requests for accommodations, Logan sought the assistance of the Human Resources Department in handling the matter. (Logan Dep. 104.) Logan's main contact in Human Resources was David Helm, the Labor and Employee Relations Manager. (Helm Dep. 6:9-14, 11.) On November 8, 2004, Logan forwarded to Helm the October 14, 2004 letter from Dr. Zucker and the other information she had received from Moultrie. (Logan Dep. 132:20-133:3, Ex. 15.) According to Helm, the Department has no specific written policy to deal with accommodation requests and Logan was able to deal with most of Moultrie's requests without authorization from Human Resources. (Helm Dep. 12:4-9, 17:17-24.)

Logan contacted Helm again on November 22, 2004 to ask how she should proceed in assisting Moultrie with her ADD, while at the same time documenting her performance. (Logan Dep. Ex. 17.) Logan also sought guidance as to whether and how to discipline Moultrie as to continuing problems with scheduling consumer transportation, following through with deadlines, processing work in a timely manner, and arriving to work on time. (Id.) Helm spoke with Logan about Moultrie's diagnosis on December 2, 2004 and then followed up by email on December 9, 2004. (Helm Dep. Ex. 1; Moultrie Dep. Ex. 29.) With regard to Dr. Zucker's letter requesting accommodations, Helm indicated that "[i]t does not appear that this rises to the level of an ADA accommodation as it is unclear from the letter if Ms. Moultrie is able to 'work' as defined in the ADA." (Id.) Nevertheless, Helm expressed willingness to work with Logan to provide some of the accommodations Moultrie requested and went on to specifically address each request. (Id.) Headphones, for example, were eventually ordered and provided to all EMTs in June 2005, though, as discussed below, there is some dispute over whether they were sufficient to meet Dr. Zucker's request. (Moultrie Dep. 149:8-24.) In speaking with Helm previously, Logan had

concluded that some of the accommodations Dr. Zucker suggested had already been implemented and moved forward on providing certain other accommodations. For example, Moultrie had previously been relocated to a quieter area[12] and the entire EMT staff had been provided with colored labels for their files at the suggestion of the consultant. (Logan Dep. 98:4-18, 134:13-19, 153:3-6, Ex. 17; Helm Dep. Ex. 1.) Moultrie had also already been placed on a flex schedule. Dr. Zucker was not aware that Moultrie was already, at her own request, on a flex schedule when he suggested that accommodation. (Zucker Dep. 77:5-25.)

Logan believed that Dr. Zucker's suggestion that Moultrie's work be broken down into manageable chunks was a difficult request due to the nature of the tasks Moultrie had to complete. (Helm Dep. Ex. 1; Moultrie Dep. Ex. 29.) Additionally, Logan had already given Moultrie advice as to how to organize her work so that she dealt with one consumer at a time and completed the scheduling for that consumer before moving on to the next consumer. (Moultrie Dep. Ex. 25; Logan Dep. 130:18-131:2.) Moultrie claims that due to the high volume of work she had, she was unable to follow that advice on many occasions. (Moultrie Dep. 145:5-146:14.) Moultrie acknowledged, however, that she had the discretion to work on whatever tasks she felt had priority and that she could take breaks as needed, though the busy nature of her job often prevented her from doing so. (Id. 59:15-24, 146:3-10, 189:4-7.)

Finally, with regard to Moultrie's request for a job coach, Logan claims that she advised Moultrie to contact the Ohio Rehabilitation Services Commission, also known as the Bureau of Vocational Rehabilitation ("BVR"). (Logan Dep. 104:14-105:12.) Again, Moultrie offers a

---

[12] In or around April 2004, the entire EMT staff moved to a different location in the building. (Logan Dep 127, Ex. 12.) In the new location, Moultrie chose a cubicle that was in a low traffic area, away from the copy machine. (Logan Dep. 99:15-18.)

somewhat different description as to what she was told regarding her request for assistance. At one point during her deposition, Moultrie stated that after she made requests for accommodations, Logan told her that the Department would not help with those kinds of accommodations. (Moultrie Dep. 112:18-113:10.) Moultrie also testified during the same deposition that she was aware that it was her own responsibility to take the steps necessary to engage the services of a job coach. (Id. 131:6-23.) Moultrie claimed she contacted BVR and that they told her they would need to speak with her supervisor before setting up a job coach to assist her. (Id. 147:7:14.) Moultrie could not recall who specifically she spoke with, but claimed that she gave them Logan's phone number and that she did not know what happened after that. (Id. 147:6-24.) Moultrie did not contact BVR again until October 2005. (Bailey Aff. Ex. 1.[13])

Meanwhile, Moultrie continued to have problems at work. On December 16, 2004, Logan contacted Helm because she had received more complaints regarding Moultrie's failure to return phone calls, schedule transportation, and mail bus tokens to consumers. (Helm Dep. Ex. 2.) Logan indicated that she might have to give Moultrie another reprimand. (Id.) Helm responded that "[m]any of the performance issues go to the essential functions of the job so ADA is not a legitimate excuse." (Id.) Shortly thereafter, on January 10, 2005,[14] Logan issued a written reprimand to Moultrie for neglect of duties, due to the following: failing to clear her

---

[13] Moultrie's BVR file is attached as Exhibit 1 to the affidavit of Kathleen H. Bailey. (See Doc. 41-2.) The first document in the file is a "Comprehensive Assessment Summary" dated October 17, 2005. To the extent that Moultrie contacted anyone at BVR in late 2004 or early 2005, there is no record of that phone call.

[14] There is also a letter from Logan to Moultrie, dated January 10, 2005, indicating that Moultrie was also placed on another action plan to monitor her punctuality. (Moultrie Dep. Ex. 34.) However, when asked about the action plan at her deposition, Moultrie claimed she did not recall receiving the plan and there is no evidence from any other witness authenticating the document. (Id. 158:22-159:25.)

voice mail on January 4, 2005 of messages that had been left prior to that date; failing to turn

WLMS and other paperwork in on time; and receiving multiple complaints from consumers

regarding her lack of response and failure to schedule transportation or send bus tokens to

consumers.  (Logan Dep. 138:18-23, Ex. 18; Moultrie Dep. Ex. 31.)  A notation on the

reprimand indicated that Moultrie refused to sign it.[15]  (Logan Dep. Ex. 18; Moultrie Dep. Ex.

31.)  With regard to her failure to clear voice messages on January 4, 2009, Moultrie claims she

was on vacation for part of the day on January 3 and the whole day on January 4.  (Moultrie Dep.

153:1-14.)  Additionally, Logan admits that consumers may leave voice messages at any time

day or night so some of the messages may have come in overnight.  (Logan Dep. 140:4-20.)

However, Logan claims that most of the messages found on Moultrie's voice mail on January 4,

2005 were messages that were left while Moultrie was at work.  (Id. 140:21-141:1.)

  During the same month, January 2005, Logan offered Moultrie a lateral transfer to an

EMT clerical position within the same unit.  Logan believed the transfer would be a better fit for

Moultrie, given her struggles with ADD, because the position was less deadline-oriented than

Moultrie's EMT position.  (Logan Aff. ¶ 2.)  According to Logan, whoever filled that position

was not to be assigned any case load.  (Id.; see also Moultrie Dep. 162:20-163:10.)  Moultrie

declined the offer because she did not trust that she would not be assigned a case load and

believed she would actually have more work because she would be providing support to all of

the EMTs, including answering phones and sometimes scheduling trips.  (Moultrie Dep. 162:9-

11, 164:5-166:13, 170:11-24, Ex. 36.)

_____

[15] When asked about the reprimand during her deposition, Moultrie claimed she did not
recall receiving it.  (Moultrie Dep. 151:20-152:11.)  However, in her Response to Defendants'
Proposed Undisputed Facts, Moultrie acknowledges that Logan issued the reprimand to her on
January 10, 2005.  (Doc. 45 at 12-13, ¶ 53.)

On February 2, 2005, Logan emailed Helm about setting up a pre-disciplinary conference for Moultrie.[16] (Logan Dep. 142:1-6, Ex. 19.) Pursuant to HCJFS's disciplinary policy, a pre-disciplinary conference is usually held before taking any disciplinary action that might result in a suspension. (Id. 142:10-22.) Typically, an independent arbitrator, or "hearing officer,"[17] is present at the conference, listens to the information, reviews the materials presented, and makes a recommendation as to discipline. (Id. 143:2-6.) Logan asked for a conference for Moultrie because she saw little to no improvement in Moultrie's performance. (Id. 143:7-16.) Logan indicated in her email to Helm that she had received over ten complaints from consumers who were not scheduled for transportation as requested since Moultrie received the written reprimand on January 10, 2005. (Id. Ex. 19.) According to Logan, many of the consumers whose transportation Moultrie had failed to schedule were dialysis patients with life-threatening conditions. (Id. 143:21-144:2.) Logan admitted during her deposition that consumer complaints were not always legitimate. (Id. 86:3-20.) Occasionally, for example, consumers provided incorrect information leading to an error in scheduling the necessary transportation. (Id.) However, according to Logan, after a complaint was brought to the attention of an EMT, it was the EMT's responsibility to contact the consumer to address the complaint and to inform Logan and any other supervisor who received the complaint in the event the complaint was not legitimate. (Id.)

---

[16] According to Logan, there were a series of disciplinary steps that had to be taken depending on the severity of the problem. Typically, the disciplinary process began with a verbal or written warning. If the behavior continued, the employee would then receive a reprimand, followed by a three to ten-day suspension, culminating if necessary in termination. (Logan Dep. 142:10-22.)

[17] The parties both refer to the arbitrator as a "hearing officer" in their pleadings.

It is unclear from the evidence whether Logan's request for a pre-disciplinary conference was granted. However, the evidence does show that at some point during March 2005,[18] Larry Mitchell, the Human Resources Director, sent Moultrie a letter notifying her that she was to serve a three-day suspension, effective April 12, 13, and 14, 2005. (Logan Dep. Ex. 21.) The stated reason for the suspension was that Moultrie had been "found guilty of inefficiency, nonfeasance, neglect of duty, and failure of good behavior," due primarily to her continued failure to schedule consumers' transportation. (Id.) On March 21, 2005, Logan sent her supervisor, Phyllis Brown, an email responding to Brown's concerns about Moultrie's performance. (Id. 17:12-20, Ex. 22.) Brown had previously contacted Logan regarding complaints she had received from a consumer who claimed the Moultrie hadn't properly scheduled her transportation for that month. (Id. Ex. 22.) In her response, Logan stated that she saw improvement in Moultrie's performance, and that Moultrie had been overwhelmed due to taking over the highest alphabet from another EMT's case load. (Id.) Logan also noted that many of the consumers assigned to Moultrie had mental health issues and did not leave accurate or audible messages. (Id.) Finally, Logan indicated that she had previously requested that Moultrie's suspension not start until April 12 so that a newly hired EMT could get a few weeks of experience and possibly deter the backlog that would occur during Moultrie's suspension. (Id.) With regard to Moultrie feeling overwhelmed during that time period, Logan believed that the other EMTs were also overwhelmed. (Id. 150:11-18.) The EMT unit was still short-staffed at that time and the EMTs were expected to do the work that they were assigned. (Id. 144:4-6,

---

[18] The date when the letter was actually sent is unclear. Mitchell's letter is dated March 10, 2005, but the Order of 3-Day Suspension attached to and sent along with the letter is dated March 18, 2005.

150:11-18, 155:12-19.)  However, Logan testified that Moultrie's performance did not improve

even after the Department hired two new EMTs – one in March and the other in May, 2005.  (Id.

157:7-14.)

On March 31, 2005, the Department moved the EMT unit to a different building.  (Logan

Dep. 127:14-17.)  In the new location, Moultrie shared a cubicle with two other employees, but

had her own desk, which faced a cubicle wall.  (Id. 127:18-128:15.)  The new location was also a

site where parents could visit children who were in the custody of Children's services.  (Id.

157:15-23.)  As a result, there were at times children running around in the work area.  (Id.

157:24-158:1.)

Shortly after the move, Moultrie served her three-day suspension.  Approximately a

month and a half after her suspension, on June 30, 2005, the Department provided headphones

for all EMTs.  (Logan Dep. 105:16-106:1, Ex. 23; Moultrie Dep. 148:1-149:3.)  The headphones

hooked up to the phone and could be used to listen to phone calls.  (Moultrie Dep. 149:14-19.)

Moultrie claims they were not the type of headphone Dr. Zucker requested[19] and that they did not

help to block out noise.  (Id. 149:8-24.)  Moultrie used the headphones sporadically.  (Id. 150:3-

8.)

On July 14, 2005, Moultrie received an interim review to which she responded in writing.

(Logan Dep. Ex. 23.)  As discussed above, the EMT Unit was short staffed throughout most of

that time period, due in part to the two positions that remained open throughout most of that

---

[19]  Moultrie maintains that the type of headphones Dr. Zucker requested on her behalf
were supposed to be "bigger and cover[] all of the sound."  (Moultrie Dep. 149:10-14.)
However, there is no evidence that Dr. Zucker described any particular type of headphones
beyond simply suggesting the Department provide "headphones or other noise masking devices."
(Logan Dep. Ex. 15.)

period and to a staff member taking FMLA leave for six weeks.  (Id. 111, Ex. 5.)  At the same time, the volume of work for the Unit was increasing.  (Id. Ex. 5.)  Moultrie's review, which covered January through June of 2005, states that Moultrie's performance was unsatisfactory during the evaluation period, citing the three-day suspension in April and continuing problems such as receiving "a multitude of consumer complaints regarding trips not being scheduled and a lack of return calls."  (Id. Ex. 23.)  In her written response, which is attached to the review, Moultrie notes the following: (1) that she had been diagnosed with ADD and had asked for, but had not received, accommodations; (2) that after she revealed her diagnosis, she was given an excessive amount of work and received increased discipline; (3) that she needed a reduced case load and continued help with filing; (4) that headphones and assistance with filing had only recently been provided to her; (5) that she was having difficulty working in the new location, where children were allowed to run, scream, and play; and (6) that she believed she was being set up to fail.  (Id.; Moultrie Dep. at 187:20-188:7, 195-96, 212.)

On July 15, 2005, one day after Moultrie received her interim review, Defendants informed Moultrie that she would have to serve a ten-day suspension starting July 18, 2005 due to continued poor performance.[20]  The stated reasons for the suspension included:

> After repeated counseling and discipline, including a 3-day suspension April 12-14, Ms. Moultrie continued to have performance related problems.  Specifically, Ms. Moultrie's Supervisor received complaints from consumers regarding: missed appointments, appointments scheduled inaccurately, her not returning their phone calls, as well as failure to follow through with the processing and mailing of bus tokens, passes and access tickets.  Ms. Moultrie's Supervisor has also received complaints from community agencies regarding her lack of response and follow through in meeting her consumer's needs.

(Logan Dep. Ex. 24.)

─────────────────

[20] Around that time, Moultrie received a fifteen-year service pin.  (Logan Dep. Ex. 25.)

A few months after returning from her suspension, Moultrie contacted BVR again seeking a job coach. (Moultrie Dep. 204:8-205:16.) Moultrie requested permission to have a job coach observe her at work in October 2005. (Id. Exs. 47, 48.) After checking with Human Resources, Logan learned that Moultrie had to submit renewed medical documentation of her ADD diagnosis. (Id. Exs. 47, 48.) Logan informed Moultrie that a job coach could work with her on October 24, 2005, but that Moultrie would have to submit the updated paperwork before the job coach could return for a second session. (Id. 206:4-208:7, Exs. 48, 49; Henderer Dep. 19:12-21.) A job coach from Jewish Vocational Services (JVS)[21] worked with Moultrie on October 24, 2005, and then after Moultrie provided the required paperwork, a different job coach returned to work with Moultrie on December 1, 2005. (Henderer Dep. 12:15-20, 31:19-22.) The second job coach, Lisa Henderer,[22] initially worked with Moultrie approximately three days a week for three-hour periods with the goal of decreasing the length and frequency of the sessions as time went on. (Id. 56:5-11, 98:3-16, Ex. 4.) As Moultrie's job coach, Henderer's goal was to provide strategies to Moultrie to allow her to work independently.

When Henderer started working with Moultrie, she found that Moultrie had not filed any paperwork for at least two years and that her work area was a mess with papers and notes everywhere. (Henderer Dep. 23:16-24:2.) Moultrie admits that she was behind in her filing, but claims that she had not gotten the same assistance with filing as some of her coworkers had

---

[21] Jewish Vocational Services is one of the agencies with which BVR contracts for job coach services.

[22] At the time of the events in question, Lisa Henderer's name was Lisa Arn.

received.[23]  (Moultrie Aff. ¶ 7.)  Henderer cleaned up Moultrie's work area and filed old papers.

Henderer also helped to organize Moultrie's files by color-coding some files using colored dots

that adhered to the front of the files and creating new files.  (Henderer Dep. 25:23-28:2, Exs. 6-

14.)  By the end of December, 2005, Henderer had worked with Moultrie thirteen times, which

amounted to thirty-nine hours.  Moultrie was excited about Henderer's assistance and tried to

learn from Henderer while Henderer was organizing the files.  (Id. 36:19-37:7.)  However,

Moultrie was still responsible for answering phone calls while Henderer was there and spent a

great deal of time on the phone.  (Id. 36:19-22, 39:1-6, 42:5-8, 67:3-23; 89.)  In fact, Henderer

estimated that Moultrie spent about ninety-eight percent of her work day on the phone.  (Id.

112:1-17.)  As Plaintiff points out, Henderer observed that one of Moultrie's coworkers did not

receive as many calls.  (Id. 39:7-10.)  However, Henderer noted that it was because the

"coworker was doing something a little different."  (Id.)

Henderer suggested several specific modifications to the manner in which Moultrie

performed her job.  For example, Henderer created a call log binder in which Moultrie could

---

[23]  Defendants claim that from October 2005 through Moultrie's removal, Moultrie
received assistance from Sharon Washington, a woman assigned to the EMT unit as part of a
work training program.  (Logan Dep. 141:4-22; Henderer Dep. Ex. 21; Washington Aff. ¶¶ 7-9.)
Washington claims she assisted Moultrie by clearing her voicemail messages, filing, making file
folders, sending letters to consumers, seeing walk in consumers, and distributing bus tokens, bus
passes and access tickets.  (Washington Aff. ¶ 9.)  Washington claims she spent approximately
seventy-five percent of her time assisting Moultrie because Moultrie was so behind.
(Washington Aff. ¶ 8.)
    Moultrie, on the other hand, claims that Washington did not begin working with her until
just before Moultrie started working with Henderer and that Washington spent most of her time
assisting others.  (Moultrie Dep. 196:15-20, 212:7-24.)  Also, Washington was not permitted to
work with Moultrie during times when Moultrie was working with Henderer.  (Moultrie Dep.
215:4-15; Washington Aff. ¶ 11.)  Finally, Moultrie testified at different points during her
deposition that at various times, clerical assistants helped other EMTs with their filing but did
not help her.  (Moultrie Dep. 125-26, 195:13-22, 196:8-20.)

document each phone call and voice mail message she received.  (Henderer Dep. 39:18-40:3.)

Prior to that time, Moultrie had mainly been using Post-it notes or scrap paper to record

messages.  (<u>Id.</u> 40:4-7.)  Henderer advised Moultrie that she could keep track of consumers'

requests by recording messages in the binder and then placing a check mark or a star next to the

request to indicate that she had called the consumer back and completed the scheduling of

transportation.  (<u>Id.</u> 39:18-40:3.)  There is some dispute over the extent to which Moultrie

actually used the binder.  Henderer testified that Moultrie sometimes failed to check people off

when she returned their calls.  (<u>Id.</u> 47:7-23.)  When Henderer spoke with Moultrie about the

problem, Moultrie indicated that she was often too busy to check people off in the binder.  (<u>Id.</u>

14-23.)  In response, Henderer suggested that Moultrie keep the binder in front of her while

talking to people.  (<u>Id.</u> 47:24-48:2.)  However, Moultrie did not feel there was enough room on

her desk for both the binder and her keyboard and she preferred to have her keyboard in front of

her.  (<u>Id.</u> 48:3-49:17.)  Henderer then cleaned and reorganized Moultrie's desk so that there

would be sufficient room for both the binder and the keyboard.  Nonetheless, Moultrie continued

to struggle with checking consumers' names off as she returned their calls, and when Henderer

asked her about the continued problem, Moultrie claimed she was simply too busy to place check

marks by consumers' names.  (<u>Id.</u> 50:9-51:13.)  Moultrie maintains that she did use the binder

although she did not keep the binder on her desk because it was too bulky.  (Moultrie Aff. ¶ 8.)

Instead, Moultrie claims she kept pages from the binder on her desk, recorded consumers' calls

on those pages, and then returned the pages to the binder at the end of the week.  (<u>Id.</u>)  Moultrie

further claims that Henderer was aware that Moultrie was using the binder in this manner.  (<u>Id.</u>)

In between sessions with Moultrie in December, Henderer left piles of paperwork for Moultrie to file so that she could determine whether Moultrie was able to organize herself and complete the filing. (Henderer Dep. 37:8-19.) When Henderer returned, Moultrie had not filed the paperwork and explained that she had not had time due to the volume of phone calls. (Id. 38:10:25.) By January 2006, Henderer was not only filing old paperwork for Moultrie, but was also filing new paperwork. (Id. 67:24-69:7.) Henderer was concerned because rather than beginning to use the file system to file current paperwork, Moultrie either left the new paperwork for Henderer to file or let the new paperwork accumulate in a separate pile. (Id. 69:1-23, 70:9-23.) Henderer reminded Moultrie she was there to help but was not there to act as Moultrie's assistant. (Id. 69:15-23.) At that point, Henderer felt that she was doing Moultrie's work for her. (Id. 74:13-18.) Henderer discussed the problem with her boss and he advised her that she should back off from doing Moultrie's work and observe her instead. (Id. 75:11-76:1.) Despite the problems, Henderer noted that Moultrie was showing "some improvement." (Id. 62:5-25, 76:18-77:4, Ex. 14.) Logan indicated to Henderer in January 2006 that due to Henderer's assistance, Moultrie had shown a little improvement as far as scheduling trips and answering phones. (Id. 78:5-22.) Moultrie was also using the call binder more consistently. (Id. 80:2-20.)

In Moultrie's performance review for the second half of 2005, which Logan and Costa completed in January 2006, Logan noted that Moultrie was receptive to criticism and worked well with her coworkers but that she needed to improve her job performance in several areas. (Logan Dep. Ex. 27.) During that period there was an increase in the number of consumers seeking assistance and as a result the workload increased. (Id. Ex. 6.) Though it appears that all of the EMTs were somewhat behind in their filing (id.), Logan noted that Moultrie was experiencing a number of other problems, including:

Moultrie should continue to work on submitting her paperwork timely. She has been behind in submitting WLMS documentation, daily contact lists, and processing trip authorizations. She has scored low consistently on her monthly file audit. Her files are not alphabetized and are missing documents. She has received complaints from consumers and community agencies regarding consumer's appointments not being scheduled timely and accurately. Ms. Moultrie is expected to demonstrate marked improvement in her job performance for the next evaluation period.

(Id. Ex. 27.) In response to the evaluation, dated January 13, 2006, Moultrie wrote that she had been working to improve her performance, had organized her files, and had received few complaints. (Id. Ex. 28.) She also claimed that she had fallen behind on processing authorizations only two to three times over the six-month period and that her files would have been organized sooner had she gotten the assistance that other employees received. (Id.) With regard to Moultrie's response, Logan maintained that although Moultrie's files may have been organized and alphabetized for a short period in January, 2006, Moultrie was not able to keep them organized. (Id. 167:4-168:1.) Logan believed Moultrie had a good attitude about trying to improve her work, but that Moultrie did not demonstrate a willingness to maintain the improvements over time. (Id. 167:6-17.)

In early February, 2006, Moultrie told Henderer that she was concerned her case load would be increased again due to one of her coworkers quitting and that she would not be able to keep up with the increased amount of work. (Henderer Dep. 85:1-18.) Moultrie was also concerned that Defendants would fire her because her performance levels were still low. (Id. 89:12-90:5.) Consistent with Moultrie's concerns, Henderer claimed that Moultrie still was unable to keep up with her work in February, 2006. (Id. 87:16-23.) By that time, Henderer had scaled back the amount of time she spent with Moultrie. (Id. 87:4-9.) Henderer spoke to her supervisor about Moultrie's lack of substantial progress and he advised Henderer to brainstorm

with other job coaches to see if they had any suggestions. (Id. 91:7-20.) Henderer spoke with her coworkers, but they offered no suggestions. (Id. 91:21-92:2.) Henderer felt that Moultrie was blaming everyone else for her problems rather than taking responsibility and advised Moultrie that it was up to her to save her job. (Id. 92:3-93:22.) Henderer further advised Moultrie that her tardiness and unscheduled time off work was interfering with her job. (Id. 94:10-24.)

Moultrie's performance did not improve in March, 2006. Henderer stated in her notes on March 10, 2006:

> The job coach is concerned because there were many files that needed to be filed as well as many papers that had to be filed. The consumer said that she is doing ok and that she would get it filed, but the job coach knows that she won't get it done.

(Henderer Dep. Ex. 25). Henderer noted similar concerns again on March 14, 2006:

> The job coach went in and had noticed that the files are still there and the manager asked [Moultrie] for paperwork that she needed to fill out from last week. With all the signs that the job coach posted around to remind her she still isn't getting her paperwork done and turned in on time.

(Id.) By the end of March, 2006 – over two years after Moultrie had received her first written warning – Logan was considering terminating Moultrie's employment and had discussed this possibility with Henderer. (Id. 109:7-14.) At that point, both Henderer and Costa, who was now in a supervisory position in the EMT unit, encouraged Plaintiff to look for another job within the agency and gave Moultrie a list of job openings for her to consider. (Id. 104:22-105:11, 107:10-108:6; Costa Dep. 25:9-26:9.) According to Defendants, Moultrie did not apply for any of those positions. (Helm Aff. ¶ 2.) Moultrie claims, in contrast, that she told Henderer she was interested in finding a different position, even a demotion, because she was concerned about losing her job. (Moultrie Dep. 216:7-18.) Moultrie further claims that she applied for one or

two positions in 2006, but was not offered interviews. (<u>Id.</u> 216:19-25.) Moultrie provided no documentation in support of her assertion that she applied for those positions. Nor did she describe what those positions were or what requirements they entailed.

Meanwhile, in early March 2006 a meeting was held between Henderer, another member of JVS, Moultrie, Logan, and Joe Gagliardo of Human Resources at HCJFS. (Henderer Dep. 109:18-110:7, Ex. 28). During that meeting, JVS requested three accommodations for Plaintiff, which were memorialized in a follow-up letter as follows:

1.  A quieter work space – i.e. a room with a door that she could close to block distracting noise traffic coming from within the work area, or a cubicle secluded from the main area of traffic.
2.  A specific time allowed on and off the phones – i.e. an hour off the phones at the beginning and end of each day so that she could focus on paperwork, sending emails, scheduling trips, and filing.
3.  A smaller case load – at the present time, with the amount of consumers Ms. Moultrie has on her case load, she is unable to complete all of the consumers work necessary to meet the needs of that caseload. Ms. Moultrie has demonstrated that when she has fewer consumers, she is able to consistently maintain her work load.

(<u>Id.</u> Ex. 28). Though Henderer believed Moultrie could perform her job with those accommodations, Henderer also thought that Moultrie's case load would have to be reduced from approximately 650 to between 20 to 30 consumers in order for Moultrie to successfully handle all aspects of her job. (<u>Id.</u> 122:3-15, 133:6-13.) However, Henderer never stated to Defendants that Moultrie's case load would have to be reduced to that extent. (<u>Id.</u> 133:14-18.)

On March 30, 2006, Defendants held another meeting to discuss the requested accommodations with Moultrie. (Costa Dep. Ex. 2; Gagliardo Dep. Ex. 1.) Defendants refused

to reduce Moultrie's case load because it would require her coworkers to perform more work.[24]
(Costa Dep. Ex. 3; Gagliardo Dep. 38:18-39:12.) According to Gagliardo, the requirement that
Moultrie carry her case load and respond to her consumers' concerns was an essential function
of her job. (Gagliardo Dep. 38:18-39:12.) Defendants did, however, grant Moultrie's second
request, giving her an hour off of the phone at the end of each day so that she could complete her
paperwork. (Henderer Dep. Ex. 31; Moultrie Dep. 221:20-222:23.) Moultrie refused to take
advantage of that hour, claiming she had too much to do and would get into trouble if she did not
answer phones. (Moultrie Dep. 222:21-23; Henderer Dep. 127:8-128:6.) Finally, with regard to
Moultrie's first request, Defendants ordered noise reducing headphones, but they did not receive
the headphones until after Moultrie's termination. (Costa Dep. Ex. 2, 3; Docs. 46-2, 46-3.)
Defendants offered to move Moultrie to a visitation room that was being used as an office.
(Logan Dep. 159:17-21.) However, Moultrie refused to move into the office because she
believed it was a "sick" room and she was concerned that it would exacerbate her allergies.
(Logan Dep. 160:3-10; Moultrie Dep. 219:4-221:6.) According to Moultrie, mold was growing
in the room and two other employees had reported breaking out in hives and feeling dizzy after
working in the room. (Moultrie Dep. 219:4-221:6; Henderer Dep. 119:5-10.) Defendants hired
an outside company to test the air quality of the room, and Moultrie was given a copy of the
company's report.[25] (Logan Dep. 160:12-18.) However, Moultrie could not understand the
report and ultimately decided not to take the room. (Moultrie Dep. 221:2-19, Ex. 53.) Costa

_____

[24] Moultrie stated that the EMT unit was so busy at that time that Defendants were considering adding another unit of EMT workers and another supervisor to handle the increased volume of work. (Moultrie Dep. 193:13-22.)

[25] Though the report itself, which is highly scientific in nature, was attached as Ex. 53 to Moultrie's deposition, no explanatory testimony was provided as to the results of the testing.

took the room after Moultrie refused and has not experienced any problems.  (Costa Dep. 34:1-23.)

At the same time, Moultrie continued to express difficulty concentrating in her cubicle. Moultrie had earlier complained that she was losing documents because Children's Services staff were taking her documents from the fax machine they shared with the EMTs.  (Moultrie Dep. 159:3-12.)  To alleviate this problem for Plaintiff, HCJFS purchased an additional fax machine for the exclusive use of EMTs, and placed it in Plaintiff's cubicle.  Within a short period of time Plaintiff complained that the fax machine was distracting to her, as EMTs came in and out of her cubicle throughout the day to get their faxes.  The fax machine was then removed from Plaintiff's cubicle. (Logan Dep. Ex. 31; Costa Dep. 43:3-21; Moultrie Dep. 223:21-224:4.)

Defendants received more complaints about Moultrie in April, 2006.  (Costa Dep. 51:19-52:10; Logan Dep. 174:6-24.)  During that month, Defendants claim Moultrie failed to schedule an appointment for a dialysis patient, and as a result the patient ended up in the hospital in respiratory distress.[26]  (Costa Dep. 51:19-52:10; Logan Dep. 174:6-24.)  Moultrie was advised of the complaint at that time.  (Moultrie Dep. 229:1-7.)  However, Moultrie maintains that when she called the consumer to apologize, the consumer did not know what Moultrie was talking about and claimed all her appointments had been scheduled.  (Id. 228:20-230:2.)

On April 26, 2006, Logan once again requested a pre-disciplinary conference for Moultrie:

---

[26] Defendants further claim that Moultrie failed to schedule the appointment despite the fact that Henderer had created a special modification for Plaintiff specifically to help Plaintiff remember to schedule dialysis patients, because "[i]t's basically life or death. If you don't get them in, they could potentially die."  (Henderer Dep. 124:14-125:16.)

Ms. Moultrie's job performance is unsatisfactory and too many of her consumers are continually missing medical appointments as Ms. Moultrie has not scheduled their trips. I have been bombarded with calls from the dialysis clinics stating that their patients are missing needed medical treatments due to a lack of transportation. Ms. Moultrie frequently tells consumers that she will return their calls but I receive calls from these same consumers that their calls were not returned. Ms. Moultrie continues to receive low scores on her monthly case file audits. Ms. Moultrie does not complete her WLMS timely. Ms. Moultrie has been involved with BVR, for her ADHD, since approximately 10-05. She has been receiving "coaching" through JVS weekly. Initially, Ms. Moultrie demonstrated improvement in her job performance with the assistance of the tools and guidance provided through JVS. However, Ms. Moultrie seems to be unable to maintain and perform her job duties even with the assistance of JVS. . . . I feel that [sic] is highly unlikely that Ms. Moultrie will be able to perform her current job duties satisfactorily even with the intervention and job coaching that she is receiving from BVR/JVS.

(Logan Dep. Ex. 31.) Logan expected that the next step in disciplining Moultrie would be to terminate her employment. (Id. 173:22-174:11.) It appeared to Defendants at that point that, although Henderer had succeeded in organizing Moultrie's office, her coaching neither increased the volume of work that Moultrie was able to perform nor decreased the number of complaints that Moultrie's supervisors received about her job performance. (Costa Dep. 35:22-36:3; Logan Dep. 174:6-24.) Defendants also felt that Moultrie was not taking advantage of the accommodations that had been granted and that there were no other steps that they could take to assist Moultrie. (Costa Dep. 51:19-52:10; Logan Dep. 176:4-177:13.)

Henderer stopped working with Moultrie on May 10, 2006 after learning that Moultrie was about to be fired. Henderer's notes from that day state the following:

The consumer meeting had been postponed until further notice. It was for her to get terminated. The consumer's BVR counselor said since there is nothing else the job coach can do, the case is closed. The counselor said that the job coach did everything she could do and did it very well, but it was too late when the job coach came in. Even though there was improvement, the consumer couldn't keep up.

(Henderer Dep. 128:10-24, Ex. 33.)  Five days later, on May 15, 2006, Defendants held a

pre-disciplinary conference, at which Moultrie was present, to address the following allegations:

- Failure to respond to consumer calls;
- Failure to schedule trips promptly and accurately;
- Supervisor continues to receive complaints from consumers regarding: missed appointments, appointments scheduled inaccurately and not returning their phone calls[;]
- Continued failure to turn in WLMS timely[; and]
- Continuation of low scores on monthly case file audits.

(Logan Dep. Ex. 32; Helm Aff. Attach. 1.)  A hearing officer, Paul Cohen, upheld the allegations

against Moultrie, except for the last one listed,[27] and noted "[t]he fact that the health and safety

of consumers are at risk for not performing the assigned tasks in an accurate and timely manner

raises the gravity of the situation."  (Id.)  The hearing officer also noted that many of Moultrie's

performance issues could be attributed to her diagnosis of ADD, but found that Moultrie's

failure to request accommodation or bring the issue to the attention of her manager in a timely

manner "compounded the problems associated with her performance."  (Id.)

Defendants terminated Moultrie's employment, effective June 7, 2006, upon a finding of

inefficiency, neglect of duty, nonfeasance and failure of good behavior.  At the time of her

termination, Moultrie was forty-nine years old.  (Helm Aff. Attach. 3.)  In September, 2006,

Defendants replaced Moultrie with Sharon Washington (D.O.B. 11/23/63).  On December 11,

2006, Moultrie filed a charge of discrimination with the Equal Employment Opportunity

---

[27] With regard to Moultrie's low scores on monthly case file audits, the hearing officer noted that "[t]he Case File Audit issue has little bearing on the findings of this hearing as the evidence showed all but one staff person received a 'Partial' or 'Did Not Achieve' on this MWO. The discussion on this issue revealed that the training in the unit tends to be 'On-the-Job' with little to no formal training.  The overall failure of the staff to perform well in this particular area is the responsibility of the management for failing to properly prepare staff, rather than a failure of staff to perform a task for which they have been trained."  (Logan Dep. Ex. 32; Helm Aff. Attach. 1.)

Commission ("EEOC") alleging age and disability discrimination.  The EEOC issued Moultrie a right to sue letter on July 27, 2007.

Moultrie filed a Complaint in this Court on October 24, 2007 (doc. 1) and a First Amended Complaint on December 10, 2007 (doc. 2).  Moultrie filed her Second Amended Complaint on February 1, 2008, alleging age discrimination under state and federal laws, disability discrimination under state and federal laws, and retaliation.  (Doc. 11.)

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." <u>Liberty Lobby</u>, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." <u>Id</u>. at 252.

## III. ANALYSIS

In their motion for summary judgment, Defendants argue that they are entitled to Eleventh Amendment immunity with regard to a number of Moultrie's federal claims, that they are entitled to summary judgment on all of Moultrie's claims, and that Moultrie's claim of age discrimination under Ohio law is barred under the election of remedies structure built into Chapter 4112 of the Ohio Revised Code. The Court need not address Moultrie's Ohio public policy claim because Moultrie explicitly does not oppose Defendants' motion for summary judgment as to that claim. The Court grants summary judgment as to the remainder of Moultrie's claims for the reasons stated below.

### A. Eleventh Amendment Immunity

Defendants first argue that they are entitled to Eleventh Amendment immunity as to Plaintiff's claims of disability discrimination, age discrimination, and retaliation under Counts I, III, and VI on the basis that Defendants constitute an "arm of the state." The Court declines to rule on issues of immunity at this time as it has determined based on the following analysis that Plaintiff's claims fail as a matter of law. The Court notes, however, that Defendants in any event failed to set forth sufficient evidence at this juncture to demonstrate that HCJFS constitutes an "arm of the state" entitling Defendants to Eleventh Amendment immunity.[28]

### B. Disability Discrimination Claims

_____

[28] Defendants carry the burden of demonstrating that they constitute an arm of the state and thus are entitled to immunity under the Eleventh Amendment. <u>Gragg v. Kentucky Cabinet for Workforce Dev.</u>, 289 F.3d 958, 063 (6th Cir.2002); <u>Regents of Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429 (1997).

35

In Counts III, IV, and V of her Second Amended Complaint, Moultrie alleges that Defendants discriminated against her due to disability in violation of the ADA, the Rehabilitation Act, and Chapter 4112[29] of the Ohio Revised Code by failing to accommodate her disability and terminating her employment. Because the ADA, Rehabilitation Act, and Ohio disability discrimination actions require the same analysis, the Court will analyze those claims together under the ADA's framework.[30] See Mahon v. Crowell, 295 F.3d 585, 589 (2002); Martin v. Barnestille Exempted Vill. Sch. Dist. Bd. of Educ., 209 F.3d 931, 934 n. 2 (6th Cir. 2000); Maddox v. Univ. of Tenn., 62 F.3d 843, 846 n. 2 (6th Cir. 1995). In order to establish a disability discrimination claim, a plaintiff must produce either direct or circumstantial evidence of discrimination. DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence is

---

[29] Ohio Revised Code § 4112.02 provides: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

[30] The Court recognizes the "ADA Amendments Act of 2008" (ADAAA), effective January 1, 2009, explicitly overruled major Supreme Court decisions construing the ADA and established that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." P.L. 110-325 § 4(A). "These amendments do not apply retroactively, however, and this Court must decide this case without regard to those amendments, using the law in force at the time the complained of activity occurred." Vaughn v. Rent-A-Center, Inc., No. 2:06- cv-1027, 2009 WL 723166, at *3 n. 1 (S.D. Ohio Mar. 16, 2009) (citing Verhoff v. Time Warner Cable, Inc., Nos. 07-4265, 07-4348, 2008 WL 4691794, at *4 (6th Cir. Oct. 24, 2008); see also EEOC v. Agro Distrib. LLC, 555 F.3d 462, 469 n. 8 (5th Cir. 2009) (2008 ADA Amendments do not apply retroactively); Geiger v. Pfizer, Inc., No. 2:06-CV-636, 2009 WL 973545, at *2 (S.D. Ohio April 10, 2009); Supinski v. United Parcel Serv., Inc., No. 3:cv-06-0793, 2009 WL 113796, at *5 n. 6 (M.D. Pa. Jan.16, 2009) (collecting cases) ("every court that has addressed the issue has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded its effective date")); Jones v. Wal-Mart Stores, East, L.P., No. 3:07-CV-461, 2009 WL 1588656, at * 3 n. 2 (E.D. Tenn. June 05, 2009).

"evidence that proves the existence of a fact without requiring any inferences." <u>Rowan v.</u>

<u>Lockheed Martin Energy Sys., Inc.</u>, 360 F.3d 544, 548 (6th Cir. 2004).  Moultrie presents no

direct evidence that Defendants unlawfully discriminated against her on the basis of her alleged

disability.  Therefore, she must make her case with indirect evidence under the burden-shifting

framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>see also</u>

<u>Monette v. Elec. Data Sys. Corp.</u>, 90 F.3d 1173, 1184-85 (6th Cir. 1996).

Under the <u>McDonnell Douglas</u> analysis, a plaintiff must first make a prima facie showing

of the discrimination claim.  If the plaintiff makes such a showing, the burden shifts to the

employer to provide a nondiscriminatory reason for its employment decision.  <u>Monette</u>, 90 F.3d

at 1186; <u>see also</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254-55 (1981).  If the

employer satisfies this burden of production, then the plaintiff must prove by a preponderance of

the evidence that the employer's proffered reason was not its true reason but was, in fact, a

pretext for illegal discrimination.  <u>Burdine</u>, 450 U.S. at 256.  The plaintiff retains the ultimate

burden of persuasion at all times.  <u>Id.</u>

Plaintiff alleges that Defendants discriminated against her on the basis of her disability

both by failing to accommodate her disability and then terminating her on the basis of her

disability.  The elements of the prima facie case that Moultrie must meet for her failure to

accommodate claims[31] differ in part from those she must meet with regard to her termination

---

[31] In order to establish a prima facie case of disability discrimination under the ADA for
failure to accommodate, Moultrie must show that: (1) she is disabled within the meaning of the
Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation;
(3) her employer knew or had reason to know about her disability; (4) she requested an
accommodation; and (5) her employer failed to provide the necessary accommodation. <u>See</u>
<u>DiCarlo</u>, 358 F.3d at 419.  If Moultrie is able to meet that burden, then the burden shifts to
Defendants to demonstrate that Moultrie cannot reasonably be accommodated, because the
accommodation would impose an undue hardship on the operation of Defendants' programs.  <u>Id.</u>

claims.[32]  The Court need not analyze those claims separately, however, as Plaintiff fails to set forth any evidence to satisfy the first element of both tests – that she is disabled within the meaning of the ADA.

Determining whether a plaintiff is disabled requires an individualized, case-by-case inquiry.  MX Group, Inc. v. City of Covington, 293 F.3d 326, 337 (6th Cir. 2002).  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of having such an impairment; or (c) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Moultrie argues that she is considered disabled under the first or third possibilities.  The Court considers each possibility below.

### 1.  Substantially Limiting Impairment

The Supreme Court has set forth a three-step approach to reading subsection (A) of the definition of disability:

> First, the Court considers whether a condition is an impairment; second, it identifies the life activity that the plaintiff relies upon and determines whether it constitutes a major life activity; and third, the Court asks whether the impairment substantially limits the major life activity.

Williams v. Stark County Bd. of County Comm'rs, 7 F. App'x 441, 445 (6th Cir. 2001) (citing Bragdon v. Abbott, 524 U.S. 624, 630-31 (1998)).

---

(citing Gaines v. Runyon, 107 F.3d 1171, 1175-76 (6th Cir.1997)).

[32] To establish a prima facie case that she was terminated in violation of the ADA, Moultrie must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) after termination, the position remained open, or Moultrie was replaced by a non-disabled employee.  Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 660 (6th Cir. 1999).

As to the first factor, Moultrie claims that she suffers from both ADD and a learning disability. For the purposes of this case, the Court assumes that those diagnoses qualify as impairments under the ADA. As to the second factor, Moultrie claims that those impairments substantially limit her major life activities of learning, thinking, and concentrating. (Doc. 46 at 27.) There is no exhaustive list of activities constituting major life activities under the ADA. However, at the time of the events that took place in this case, the Supreme Court "cited with approval the regulations promulgated under the Rehabilitation Act defining major life activities to include 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Mahon, 295 F.3d at 590 (quoting 45 C.F.R § 84.3(j)(2)(ii) and citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002)). The Supreme Court further emphasized that the term "major life activities" should "be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., 534 U.S. at 197. Of the three major life activities identified by Moultrie, only one – learning – is explicitly identified as a major life activity under the Rehabilitation Act regulations. The Sixth Circuit previously has held that concentrating is not a major life activity under the ADA.[33] Boerst v. General Mills Operations, Inc., 25 F. App'x. 403, 406 (6th Cir. 2002) ("Sleeping and working are major life activities under the ADA. Concentrating and maintaining stamina are not."); see also Van Compernolle v. City of Zeeland, No. 1:05-CV-133, 2006 WL 1460035, at *7 (W.D. Mich May 24, 2006); but see Swanson v. Univ. of Cincinnati, 268 F.3d 307, 314 (6th Cir. 2001) (noting that in "regard to major life activities, the district court and

_____

[33] Even if the Court were to consider concentrating to be a major life activity, the Court would nonetheless find, for many of the same reasons stated below, that Moultrie offered no evidence that her impairment substantially limited her ability to concentrate.

parties also assume that sleeping, concentrating, communicating, and working are major life activities.").  The Sixth Circuit also has expressed doubt that thinking constitutes a major life activity.  Hill v. Metropolitan Government of Nashville, 54 F. App'x 199, 201 (6th Cir. 2002).  However, for the purposes of this opinion, the Court assumes that thinking qualifies as a major life activity.  The Court, therefore, must determine whether Moultrie is substantially limited in her ability to think and learn.

In her attempt to show that her impairments substantially limit her ability to think and learn, Moultrie relies on evidence of her difficulty in school and the testimony of two doctors, Dr. Zucker, discussed above, and Dr. Steven Sparks, who was retained by Defendants to evaluate Moultrie for this case.  The Court has evaluated this evidence as described below and finds that, even when viewed in a light most favorable to Moultrie, the evidence does not demonstrate that Moultrie's impairments substantially limit major life activities as required to qualify as a disability under the ADA.

As to Moultrie's difficulties in school, the evidence indicates that Moultrie  received mostly Ds and Fs during high school and dropped out during her junior year.  (Sparks Dep. 41:14:18; Moultrie Dep. 16:5-20, Ex 1; Zucker Dep. 14:16-22, 44:12-16.)  According to Dr. Sparks, there was no documented history of ADD or ADHD in Moultrie's school records, none of which were provided to the Court.[34]  (Sparks Dep. 41:19-42:3.)  When asked whether her

_____

[34] What little information the Court notes regarding Moultrie's performance in school was gleaned from the deposition testimony of Moultrie, Dr. Zucker, and Dr. Sparks.

school records support a diagnosis of ADHD,[35] Dr. Sparks responded that "[i]t's hard to say . . . because there's a lot of reason people get good or bad grades." (Id. 41:14-42:3.)

As to Moultrie's current condition, the testimony of Dr. Zucker and Dr. Sparks indicates that Moultrie has some difficulty with organization, concentration, planning, and performing multiple tasks at once. As described above, Dr. Zucker, who saw Moultrie a total of three times, diagnosed Moultrie with ADD in 2003. During his deposition, Dr. Zucker indicated that certain of Moultrie's behaviors fit into her diagnosis of ADD, inactive type. For example, Moultrie reported to him that she was two months behind on completing her "mileage" reporting,[36] that when she reads books, she reads the back first rather than reading the book from start to finish, and that she has difficulty paying her bills on time. (Zucker Dep. 51-52, 70:13-17.) Dr. Zucker found that Moultrie had a need for deadlines and structure, but he did not specify the type of deadline or structure that Moultrie needed and declined to generalize the needs of persons with ADD. (Id. 52:16-55:12.) Dr. Zucker further found that Moultrie's disorder manifested itself in problems with paying attention to details relevant to the task she is performing, control, organization, planning, distraction, and difficulty performing multiple tasks at once. (Id. 71:11-18, 75:6-24, 76:5-77:4.) Finally, Dr. Zucker believed that Moultrie's job was already difficult, but that Moultrie's condition made it more difficult for her to do her job. (Id. 84:1-4.)

The second doctor whose testimony Moultrie relies upon is Dr. Steven Sparks, who was retained by Defendants to evaluate Moultrie for this case. Based on his evaluation of Moultrie,

---

[35] Although Moultrie was diagnosed with ADD, the attorneys at times erroneously refer to the disorder as ADHD or Attention Deficit Hyperactivity Disorder.

[36] Dr. Zucker does not describe what mileage Moultrie was behind in completing. Nor does he indicate whether it was a work-related or non-work-related task. (Zucker Dep. 51:12-24.)

Dr. Sparks concluded that Moultrie has a learning disability characterized as a "weakness in abstract perceptual reasoning, as compared with intellectual potential." (Sparks Dep. 23:1-11.) In reaching that conclusion, Dr. Sparks had Moultrie perform several diagnostic tests. Based on those tests, Dr. Sparks determined that Moultrie had an IQ of 78, though he did not believe the score fairly represented Moultrie's IQ. (Id. 28:3-20.) According to Dr. Sparks, a full-scale IQ score is less useful in cases such as Moultrie's where there is a split in different abilities. In Moultrie's case, Dr. Sparks found that the difference between Moultrie's performance and verbal abilities was statistically significant.[37] (Id. 30:13-31:3; Pl. Ex. D.[38])

When asked how Moultrie's learning disorder would generally affect her, Dr. Sparks testified that Moultrie would have more difficulty learning tasks that were of an abstract visual nature, such as tasks associated with carpentry or electrical engineering, than she would performing tasks of a verbal nature. (Sparks Dep. 24:7-25:5.) Dr. Sparks was also specifically asked how the disability would affect Moultrie's ability to think and learn. As to Moultrie's ability to think, Dr. Sparks testified that her disability would only effect her to the extent that she would have trouble with abstract visual reasoning, and gave the example that she might have difficulty with interior design. (Id. 51:21-52:12.) As to her ability to learn, Dr. Sparks stated that Moultrie would be more receptive to verbal forms of learning, meaning she would rather have someone tell her how to do something than receive instructions in the form of pictures. (Id. 52:13-20.) Finally, with regard to her job as an EMT, Dr. Sparks expressed the opinion that

---

[37] Moultrie scored in the low range on assessments dealing with perceptual organization and processing speed, but scored higher on tests assessing her verbal and working memory abilities. (Sparks Dep. 25:22-28:1; Pl. Ex. D.)

[38] Exhibit D to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (doc. 46) is a copy of Moultrie's WAIS-IV diagnostic form.

Moultrie's disability would have adversely affected her ability to engage in some job-related tasks.  (Id. 66:1-22.)

Dr. Sparks also did not state that Moultrie would be unable to complete all visual or abstract tasks.  Rather, he indicated that someone with a learning disability similar to Moultrie's might need extra instruction or extra time to complete a task of that nature.  (Sparks Dep. 50:1-8.)  Sparks also believed that Moultrie should be able to self-adjust to her disability, stating as follows:

> You know, it just has to do with abstract reasoning, and people reason differently.  People reason verbally.  People reason more with abstract shapes and numbers.
> I can't remember phone numbers.  I just can't.  But I can remember the shape of how the numbers go, so that's why I know how to call people.  I dial the shape.  This would be a strength for me.  It would be a weakness for her.  So she would remember the number by memorizing the number.  She is actually very good with numbers.
> So it's one of those things where you have these two ways of thinking that come together, and they sort of feed into everything.  And people lean to their strengths. . . . So it's not like she couldn't do anything because of this difficulty.  She would just learn where her strengths and weaknesses are and find other ways to do things.

(Id. 50:23-51:20.)  Thus, for example, Dr. Sparks indicated that Moultrie might have difficulty with filing or organizing, depending on the task, but also stated that Moultrie could "probably organize very well, verbally."  (Id. 25:6-15, 49:7-12.)  In other words, the level of difficulty Moultrie experienced would depend on the manner in which she performed the task.

Considering the facts described above, the Court finds no evidence that Moultrie is substantially limited in her ability to think or learn.  Merely having an impairment or medical diagnosis does not make a plaintiff disabled under the ADA; Moultrie must also show that the impairment substantially limits a major life activity.  Toyota Motor Mfg., 534 U.S. at 195; MX Group, Inc., 293 F.3d at 337.  Under the law applicable to this case, the term "substantially

limits," like the term "major life activities," is construed narrowly.  See Mahon, 295 F.3d at 590.

"Substantially limits" means "unable to perform a major life activity that the average person in

the general population can perform; or significantly restricted as to the condition, manner or

duration under which an individual can perform a particular major life activity."  29 C.F.R. §

1630.2(j)(1).  Factors to be considered include "the nature and severity of the impairment; the

duration or expected duration of the impairment; and the permanent or long-term impact, or the

expected permanent or long-term impact of or resulting from the impairment."  Id. at §

1630.2(j)(2).  Additionally, "if a person is taking measures to correct for, or mitigate, a physical

or mental impairment, the effects of those measures – both positive and negative – must be taken

into account when judging whether that person is 'substantially limited' in a major life activity

and thus 'disabled' under the Act."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).

Moultrie provided no evidence that she is either (1) unable to perform the tasks of

thinking and learning, or that she is "significantly restricted as to the condition, manner or

duration under which" she can perform those tasks.  See 29 C.F.R. § 1630.2(j)(1).  The record

reveals that Moultrie's impairments may have had some affect on her ability to concentrate and

multitask.  The record also reveals Moultrie may have experienced some level of difficulty with

control, organization, planning, and abstract visual reasoning.  There is no evidence, however,

that Moultrie's difficulty in performing those tasks significantly restricts her ability to think and

learn.  At most, Moultrie has shown evidence of a moderate impairment.  Such an impairment

does not establish a disability under the ADA.  See Mahon, 295 F.3d at 590-91 (An "impairment

that only moderately or intermittently prevents an individual from performing major life

activities is not a substantial limitation under the Act.").

The fact that Moultrie apparently received poor grades in high school provides some indication that she may have experienced difficulty learning at that time. However, there is no evidence in the record to establish that Moultrie's impairments presently inhibit her capacity to think or to learn to any significant degree. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 508 (7th Cir. 1998) (noting that evidence concerning the plaintiff's past difficulties in school was not evidence that her learning disability presently limited her capacity to learn); Dorn v. Potter, 191 F. Supp. 2d 612, 623 (W.D. Pa. 2002) (finding that middle school and high school transcripts did not support a conclusion that plaintiff was substantially limited in any major life activity at the time of the alleged adverse employment actions at issue).

Dr. Zucker offered no testimony as to Moultrie's current ability to learn and his testimony regarding Moultrie's difficulty with concentration, organization, control, multi-tasking, and organization reveals nothing as to the severity of Moultrie's impairments. In fact, there is no indication from Dr. Zucker's testimony that Moultrie is significantly more restricted in those activities than the average person. The concrete examples Dr. Zucker provided to illustrate the effect of Moultrie's impairments, such as her difficulty paying bills or completing paperwork in a timely manner, similarly fail to illustrate a substantial impairment. See Coen v. Riverside Hosp., No. 3:97CV7425, 1999 WL 1491697, at *7 (N.D. Ohio Oct. 8, 1999) (finding that evidence that a plaintiff who suffered from ADD and a seizure disorder may have had some difficulty following directions, doing more than one task at once, and writing reports failed to support the plaintiff's claim that she had a substantially limiting impairment); Felten v. Eyemart Express, Inc., 241 F. Supp. 2d 935, 943 (E.D. Wis. 2003) (holding that symptoms such as forgetfulness, lack of focus, difficulty multi-tasking, and bad memory are commonplace for the average person and concluding that plaintiff failed to demonstrate that his symptoms exceeded

the experience of the general population such that he was substantially limited).  Dr. Zucker's statement that he believed Moultrie's ADD made it more difficult to do her job was specific to Moultrie's ability to perform her EMT job and provides no evidence that Moultrie's ability to think or learn is severely impaired.  To the contrary, it is simply a recognition that Moultrie's ADD might make it somewhat more difficult to perform a job that Dr. Zucker already perceived to be a difficult job in general.[39]

Dr. Sparks testimony similarly provides no evidence of a severe impairment.  Though Dr. Sparks indicated that Moultrie's learning disability would have some effect on her ability to think and learn, his testimony essentially revealed that Moultrie would have more difficulty thinking and learning when faced with a task of an abstract visual nature than when faced with a task that is more verbal in nature.  Moreover, Dr. Sparks opined that Moultrie should be able to overcome her weakness with abstract visual reasoning by using her verbal skills.  Moultrie further testified that when she takes Adderall, the drug prescribed to treat her ADD, she is better able to focus, suggesting that her symptoms are lessened when she is on medication.  Finally, Moultrie also testified that she currently operates her own janitorial business and that her ADD does not impede her ability to perform that job.  (Moultrie Dep. 6:19-9:9.)

The Court recognizes that Moultrie's diagnoses suggest impairments that restrict her abilities to think and learn to some extent.  However, Moultrie set forth no evidence demonstrating that these impairments substantially limit major life activities.  If it were the case that Moultrie's impairments were considered so severe as to amount to a disability then anyone

---

[39] Similarly, Dr. Spark's opinion that Moultrie's learning disability would have adversely affected her ability to engage in some job-related tasks does not demonstrate that her ability to think and learn are severely impaired.

experiencing problems with paying attention, organization, and abstract visual reasoning would qualify as disabled under the ADA. It cannot be that the ADA was intended to cast such a wide net.[40] To read the ADA as such would negate the requirement that a plaintiff demonstrate a <u>substantial</u> impairment.

## 2. Regarded as Disabled

Having determined that Moultrie fails to create a genuine issue of material fact as to whether her impairments substantially limit one or more of her major life activities, the Court next considers whether there is evidence indicating that Defendants regarded Moultrie as disabled. An individual may be "regarded as" disabled if

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

<u>Sutton</u>, 527 U.S. at 489. The Sixth Circuit has held that "[t]his part of the [ADA] is intended to allow individuals to be judged according to their actual capacities, rather than through a scrim of myths, fears, and stereotypes accruing around a perceived impairment." <u>Mahon</u>, 295 F.3d at 592 (quotation marks omitted); <u>see also</u> <u>Knight v. Metropolitan Government of Nashville and Davidson County, Tenn.</u>, 136 F. App'x 755, 760 (6th Cir. 2005).

Moultrie alleges that Defendants regarded her as disabled but cites to no evidence to support that allegation. Rather than cite to the factual record, Moultrie relies heavily on <u>Ross v.</u>

---

[40] The Court is mindful that the ADAAA significantly expanded the definition of disability. However, as discussed above, this Court is to apply the law in force at the time the activity of which Moultrie complains occurred.

Campbell Soup Co., 237 F.3d 701 (6th Cir. 2001), for the proposition that the "regarded as" prong of disability is concerned with the employer's state of mind and should therefore be left for a jury to decide. In Ross, the plaintiff presented substantial proof that the employer relied on a misperception of disability and discriminatory animus in its decision to terminate the plaintiff, such that motive was a factual issue. However, the Sixth Circuit often has viewed the question of whether a plaintiff was "regarded as" disabled as one that may be ruled upon as a matter of law at the summary judgment stage. See Cotter v. Ajilon Services, Inc., 287 F.3d 593, 600-01 (6th Cir. 2002); Cannon v. Levi Strauss & Co., 29 F. App'x 331, 335-36 (6th Cir. 2002); Whitson v. Union Boiler Co., 47 F. App'x 757, 761 (6th Cir. 2002). "Where there are no genuine disputes of material fact, even a subjective issue such as motive is proper for resolution on summary judgment, since the Court is not required to weigh evidence, make credibility determinations, or determine the truth of the matter." Dunaway v. Ford Motor Co., 134 F. App'x 872, 877 n. 3 (6th Cir. 2005) (finding the plaintiff failed to show he was regarded as disabled because he did not "present[] the type of evidence necessary to support his argument Ford considered him substantially limited in his ability to perform the major life activities of prolonged standing, climbing, squatting, kneeling, and lifting more than 30 pounds in his daily life").

Here, though Moultrie presented some evidence that Defendants were aware of her ADD and may have believed it had some impact on her job performance,[41] Moultrie has presented no

---

[41] The Court recognizes, for example, that the hearing officer at Moultrie's last pre-disciplinary conference opined that many of Moultrie's performance issues could be attributed to her diagnosis of ADD. However, the fact that the hearing officer believed Moultrie's impairment had some impact on her ability to perform the functions of her EMT job is not evidence that Defendants believed she was substantially limited in any major life activities, such as thinking or learning. See Dunaway, 134 F. App'x at 878.

evidence that Defendants viewed her ADD as substantially limiting any of her major life activities of thinking or learning[42] or that HCJFS had a discriminatory motive in its decision to terminate her. See id. at 878 ("Further, the Court's focus in the regarded as disabled inquiry is not on the defendant's belief about the plaintiff's ability to perform functions on the job, but rather the defendant's belief about "the effect of the impairment on the individual's daily life."). There mere fact that Defendants recognized Moultrie's diagnosis of ADD and provided her with some of the accommodation she requested does not indicate that they regarded her as disabled.[43] See Plant v. Morton Intern., Inc., 212 F.3d 929, 938 (6th Cir. 2000) (finding that a plaintiff could not show that he was regarded as disabled through evidence that his supervisor was aware of his medical restrictions and modified the plaintiff's responsibilities based on those restrictions); Linser v. State of Ohio, Dep't of Mental Health, No. 99-3887, 2000 WL 1529809, at *4 (6th Cir.

_____

[42] Plaintiff did not argue that she is substantially limited in the major life activity of working or that Defendants regarded her as such. Even if Plaintiff had made that argument, the Court similarly would find that she failed to set forth sufficient evidence to create a genuine issue of fact as to whether Defendants regarded her as disabled. See McElroy v. Philips Med. Sys. N. Am., Inc., 127 F. App'x 161, 169 (6th Cir. 2005) ("The evidence simply is not sufficient to lead a rational trier of fact to conclude [the defendant] regarded McElroy as having an impairment that prevented him from performing a broad class of jobs."); Cotter, 287 F.3d at 600-01 (noting that "an employer does not necessarily regard an employee as disabled simply by finding the employee to be incapable of satisfying the singular demands of a particular job" (internal quotation marks omitted)); Fitzgerald v. Boone County Pub. Safety Ctr., No. 04-149-DLB, 2006 WL 2714870, at *9-10 (E.D. Ky. Sept. 22, 2006) (finding that evidence that the defendant believed the plaintiff suffered from a hearing impairment that prevented her from performing a dispatch job was insufficient to create a genuine issue of fact as to whether the defendant regarded her as substantially limited in the major life activity of working, and noting that the plaintiff "was required to show that [the defendant] regarded her as unable to work in a broad class of jobs or a broad range of jobs in various classes").

[43] Defendants point out in their statement of fact that the hearing officer at Moultrie's May 16, 2006 pre-disciplinary conference noted that many of Moultrie's performance issues could be attributed to her diagnosis of ADD. However, this statement does not demonstrate that Defendants regarded Moultrie's ADD as substantially limiting her ability to learn and think.

Oct. 6, 2000) ("The fact that [d]efendants previously granted [plaintiff's] request for accommodation does not by itself establish that [d]efendants regarded [plaintiff] as disabled.").

Again, Defendants' knowledge or belief that Moultrie suffered from an impairment is insufficient to show that they regarded her as disabled. Instead, Moultrie must provide evidence that Defendants believed her to be substantially limited in her performance of a major life activity. See Felten, 241 F. Supp. 2d at 944 ("A plaintiff must show more than that the employer was aware of the impairment. He must show that the employer knew of the impairment and believed that he was substantially limited in a major life activity because of it."); Fitzgerald v. Boone County Pub. Safety Ctr., No. 04-149-DLB, 2006 WL 2714870, at *6 (E.D. Ky. Sept. 22, 2006) (noting that a plaintiff alleging she was regarded as disabled "must point to proof that the [defendant] perceived her impairment substantially limits a major life activity"). Moultrie presents no evidence to support that conclusion. According, the Court finds that Moultrie fails to demonstrate that she is disabled under the ADA. Defendants therefore are entitled to summary judgment as to Moultrie's disability discrimination claims under the ADA, Rehabilitation Act, and Chapter 4112 of the Ohio Revised Code.

## C.    Disability Retaliation Claims

In Counts VI, VII, and VIII of her Second Amended Complaint, Moultrie alleges that Defendants retaliated against her after she disclosed her diagnosis of ADD and requested accommodations, in violation of the ADA, the Rehabilitation Act, and Chapter 4112 of the Ohio Revised Code. In order to prove a prima facie retaliation claim Moultrie must show that: (1) she engaged in protected activity; (2) she suffered adverse employment action; and (3) a causal

connection existed between the protected activity and the adverse action.[44]  Penny v. United

Parcel Serv., 128 F.3d 408, 417 (6th Cir. 1997).  If Moultrie establishes a prima facie case of

retaliation, the burden shifts to Defendants to establish a legitimate, nondiscriminatory reason for

the adverse employment action.  Id.  Moultrie then bears the ultimate burden of proving that the

proffered reason for the action was merely a pretext for discrimination.  Id.; see also Hamilton v.

General Elec. Co., 556 F.3d 428, 435 (6th Cir. 2009); Johnson v. Univ. of Cincinnati, 215 F.3d

561, 581 (6th Cir. 2000) ("To fully dispose of the remaining inquires under the McDonnell

Douglas framework, we must also determine whether Defendants offered a legitimate,

nondiscriminatory reason for Plaintiff's dismissal and whether Plaintiff can show that the reasons

were a mere pretext for retaliatory discrimination.").

　　　　The Court need not address whether Moultrie shows a prima facie case, because she has

failed to produce any evidence that Defendants' reason for terminating Moultrie's employment

was mere pretext and therefore has failed to demonstrate any genuine dispute of material fact on

the issue of retaliation such that a reasonable juror could find in her favor.  See Ladd v. Grand

Trunk Western R.R., Inc., 552 F.3d 495, 502 (6th Cir. 2006) (declining to consider elements of

prima facie case due to determination that the plaintiff failed to demonstrate pretext).

Defendants' asserted nondiscriminatory reason for terminating Moultrie is that she was

terminated for "inefficiency, neglect of duty, nonfeasance and failure of good behavior, in that,

after repeated counseling and discipline, Plaintiff continued to have serious performance related

problems."  (Doc. 41 at 62.)  As described in the factual background above, the performance

---

[44] As with Moultrie's disability discrimination claims, the Court considers Moultrie's
federal and state claims under federal law.  Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d
309, 314 (6th Cir. 2001) (state and federal retaliation claims can be considered together – state
law claims survive or fail with federal claims).

related problems to which Defendants refer include Moultrie's failure to turn in WLMS paperwork in a timely manner, respond to consumer calls, and schedule trips promptly and accurately, as evidenced by consistent complaints that Moultrie's supervisors received from consumers regarding Moultrie's failure to schedule appointments, inaccurate scheduling of appointments, and failure to return consumers' phone calls.

Moultrie attempts to rebut Defendants' reasons for terminating her by arguing that Defendants' stepped up discipline against Moultrie as soon as she informed Logan that she had ADD. Specifically Moultrie argues that in March 2004, after Logan's supervisor, Brown, learned that Moultrie thought she had ADD, Brown instructed Logan to discipline Moultrie, just as she had been disciplining Moultrie's co-worker, Bailey Hill. As noted above, Hill was another EMT who was disciplined and ultimately terminated because he did not complete his work on time, took extended lunch breaks, and provided transportation to consumers without documentation. Moultrie further claims that after she asked for accommodations, Logan gave her higher case loads and increased the level of disciplinary actions taken against her.[45] Finally,

---

[45] Moultrie additionally claims that "[t]he very fact that Defendants told JVS that by the time they came it was too late suggests that the decision to terminate Moultrie was already certain." (Doc. 46 at 32; see also doc. 45 at 21, ¶¶ 141-42.) That statement is at best unsupported by evidence and at worse a misrepresentation of fact. The allegation is based on a passage in Henderer's notes stating the following:

> The consumer meeting had been postponed until further notice. It was for her to get terminated. The consumer's BVR counselor said since there is nothing else the job coach can do, the case is closed. The counselor said that the job coach did everything she could do and did it very well, but it was too late when the job coach came in. Even though there was improvement, the consumer couldn't keep up.

(Henderer Dep. 128:10-24, Ex. 33.) Without providing any evidence in support of her assumption, Moultrie assumes that the "BVR counselor" was a representative of any of the Defendants rather than a representative of BVR. To the contrary, the fact that the counselor was

Moultrie claims that Defendants acted in bad faith in failing to accommodate her after her requests for accommodation.

Moultrie's rebuttal evidence is not sufficient to establish pretext. A plaintiff may establish pretext by showing that the employer's proffered reason for an adverse employment decision had no basis in fact, did not actually motivate the decision, or was insufficient to motivate the decision. Ladd, 552 F.3d at 502 (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)). As the Sixth Circuit explained in Manzer,

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are "factually false." [Baxter Healthcare, Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123-24 (7th Cir. 1994)]. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity." [St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)]. As Hicks teaches, such a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.

> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

---

described as a "BVR counselor" indicates that the counselor was an employee of BVR rather than an employee of HCJFS. Accordingly, the Court finds no evidence that Defendants ever told anyone from JVS that By the time they provided assistance, it was too late to help Moultrie.

Manzer, 29 F.3d at 1084.

Moultrie pointed to no evidence suggesting that Defendants' reasons for terminating her had no basis in fact or that the reasons were insufficient to justify her termination. As to the first method of proving pretext, Moultrie's performance problems, as described above, are well-documented and Moultrie acknowledged having problems dealing with consumers and paperwork in a timely fashion. As to the third option, though there is some evidence that other EMTs had similar problems filing and organizing their paperwork, there is no evidence that their organizational problems were as severe as Moultrie's. Nor is there any evidence that other EMTs who were not fired had similar problems returning consumers' phone calls or handling their transportation requests.

Moultrie instead attempts to show that it was her alleged disability rather than her employment problems that actually motivated Defendants to fire her. Contrary to Moultrie's assertion, there is no evidence suggesting that it is "more likely than not that the employer's explanation is a pretext, or coverup." Manzer, 29 F.3d at 1084 (internal quotation marks omitted). Moultrie attempts to paint this case as one in which the plaintiff was doing a relatively satisfactory job until notifying her employer of a disability or health issue, after which time the employer decided to begin disciplining Moultrie and documenting performance problems. To the contrary, the evidence shows that Moultrie's supervisors were dissatisfied with her performance shortly after she took the EMT position. By the time Brown instructed Logan to proceed with another disciplinary measure in March 2004, Moultrie had already received a written warning from Logan regarding her excessive use of the telephone for personal calls. Though the warning was specifically related to phone usage, Logan notified Moultrie in the warning that she had received complaints from consumers who were either unable to contact

Moultrie due to Moultrie's failure to clear her voice mail or return calls or whose transportation requests were not scheduled properly. The fact that Brown instructed Logan to discipline Moultrie in the same manner as another EMT, Bailey, provides no evidence of pretext. To the contrary, it demonstrates that Defendants treated Moultrie similarly to other non-disabled EMTs. Similarly, the fact that Defendants progressively increased Moultrie's discipline shows that Defendants disciplined Moultrie consistent with HCJFS's progressive scale of discipline rather than demonstrating pretext. Indeed, the uncontroverted evidence shows that Moultrie failed to demonstrate any sustained improvement of her performance and received consistent and repeated complaints regarding her failure to properly meet consumers' needs.

Moultrie suggests that she could not improve her performance because Defendants acted in bad faith in failing to grant her requests for accommodation. Again, the evidence does not support Moultrie's view of her termination. Instead, the evidence shows that Defendants worked with Moultrie on some of her requests, but did not grant others, such as a request for a reduced case load, because such requests went to the essential functions of Moultrie's job. Defendants gave Moultrie repeated opportunities over several years to improve her performance, but eventually determined that her performance issues were placing HCJFS consumers in danger. Even viewing the evidence in a light most favorable to Moultrie, the Court finds that Moultrie failed to produce any evidence showing that her performance problems were not Defendants' actual reason for terminating her. Defendants therefore are entitled to summary judgment on Moultrie's retaliation claims.

### D. Age Discrimination Claims

The Court also finds that Defendants are entitled to summary judgment as to Moultrie's age discrimination claims. The Court applies the same general framework to analyze Moultrie's

age discrimination claims at the summary judgment stage as the Court applied to analyze her disability discrimination claims.[46]  Namely, because Moultrie's evidence of alleged discrimination is indirect, the Court applies the three-part burden-shifting test outlined in McDonnell Douglas, 411 U.S. at 802-04.[47]  In applying that framework, the Court is mindful that the Supreme Court recently eliminated the "mixed-motive" case under the ADEA and held that "[t]o establish a disparate-treatment claim under the plain language of the ADEA, ... a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2350 (2009).

The only evidence of age discrimination that Moultrie presents is that the woman who filled Moultrie's position after her termination was seven years younger than Moultrie.  Indeed, there is so little evidence of age discrimination that Moultrie did not even state her own age in her statement of facts.  For the same reasons discussed above, the Court finds no evidence of

---

[46] The Court analyzes Moultrie's federal and state age discrimination claims under the same framework.  "Under Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 357 (6th Cir. 1998).

[47] The court notes that the Supreme Court recently issued an opinion discussing the burden of persuasion under the ADEA, Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009). The Court does not understand Gross as altering the use of the McDonnell Douglas framework at summary judgment on ADEA cases, at least to the extent that the McDonnell Douglas framework shifts the burden of production.  See Misner v. Potter, No. 2:07-CV-330 CW, 2009 WL 1872598, at *2 n. 2 (D. Utah June 26, 2009); Guy v. Weaver Popcorn Co., Inc., No. 1:07-cv-1668-SEB-TAB, 2009 WL 1853168, at *6 (S.D. Ind. June 25, 2009) (applying the McDonnell Douglas framework to an ADEA claim while noting the Supreme Court's decision in Gross).

pretext in this case. Accordingly, Moultrie fails to meet her burden at this stage and Defendants are entitled to summary judgment as to Moultrie's state[48] and federal age discrimination claims.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss and Motion for Summary Judgment as to all of Plaintiff's claims.

IT IS SO ORDERED.

_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

---

[48] The Court need not determine whether Moultrie is barred from bringing her state law age discrimination claim due to her decision to pursue an administrative remedy with the EEOC, as the Court already has determined that Moultrie fails to set forth sufficient evidence to survive summary judgment.